UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 13-10238-DPW |
| ROBEL PHILLIPOS, | ) | |
| | ) | **FILED UNDER SEAL** |
| Defendant. | ) | |

**GOVERNMENT'S MOTION IN LIMINE TO EXCLUDE
THE TESTIMONY OF DR. RICHARD LEO AT TRIAL**

The defendant seeks to introduce the testimony of Dr. Richard Leo ("Leo"), a law professor and sociologist from the University of San Francisco School of Law, on the subject of false confessions and specifically, to opine that the defendant's confession resulted from the use of "psychologically coercive" and "guilt-presumptive tactics" and "specific interrogation techniques" designed to elicit a false and unreliable confession.  *See* Report of Leo at 4.[1]  The government moves to exclude Leo's testimony on the grounds that his methodology is unreliable, overly subjective, and his research fails to meet the standards of scientific rigor required under Fed. R. Evid. 702.  Leo's testimony should also be excluded because it will not be helpful to the jury as the concept of false confessions is well within the common knowledge of lay persons.  This Court will likely instruct this jury, as it did in *U.S. v. Azamat Tazhayakov*, to consider all the circumstances surrounding the law enforcement interviews in evaluating the statements the defendant made to law enforcement.  Many of the same factors about which Leo seeks to testify can be brought to the jury's attention through cross-examination or jury instructions (*e.g.*, the number and length of law enforcement interviews, law enforcement's demeanor and tone of voice when interviewing the defendant, what the agents said to the

---

[1] A true and accurate of Leo's report is attached as Exhibit A.

defendant prior to his confession, etc.). The jury alone should make the credibility determinations necessary to deciding whether the defendant committed the charged offense.

Further, Leo seeks to testify that the defendant's written confession was psychologically coerced and likely false. Such false confession testimony violates Fed. R. Evid. 704(b) as it seeks to usurp the role of the factfinder, especially where, as here, the defendant is charged with making false statements. By asserting that the defendant's written statement that he was present when the evidence was removed from Dzhokhar Tsarnaev's dormitory room is unreliable and false, Leo would improperly be offering his opinion that the defendant is not guilty. *See United States v. Jacques*, 784 F. Supp.2d 59, 63 (D. Mass. 2011) ("'expert' cannot offer an opinion as to guilt or innocence at a criminal trial"). Lastly, Leo's false confession testimony should be excluded under Fed. R. Evid. 403 as it will likely confuse and mislead the jury and its probative value is substantially outweighed by the danger of unfair prejudice.

As noted in the Government's Motion *in Limine* to exclude two other defense witnesses, the First Circuit has only found expert testimony on the subject of false confessions admissible where the defendant suffered from a recognized mental disorder (pseudologia fantasica, sometimes referred to as Munchausen's Disease) and sought to introduce testimony from a psychiatrist that he "suffered from a recognized mental disorder that caused him to make false statements even though they were inconsistent with his own self-interest." *United States v. Shay*, 57 F.3d 126, 132-34 (1st Cir. 1995). The *Shay* case is inapposite. Defendant Robel Phillipos ("Phillipos") does not suffer from any recognized or specific medical or mental condition that made him more susceptible to making a false confession. Indeed, Leo does not claim Phillipos has a mental disability or low IQ. Rather, based solely upon the results of the Gudjonsson Suggestibility Scale ("GSS") testing performed by Dr. Davidoff, Leo has concluded that

Phillipos' personality and "high level of suggestibility" … significantly elevate the risk that he will make or agree to a false statement, admission and/or confession under the stress of accusatory police interrogation."  Suggestibility, however, unlike Munchausen's Disease, is not recognized as a mental disorder in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5).[2]  Further, as detailed in the Government's Motion *in Limine* to Exclude the Testimony of Drs. Davidoff and Wartenberg, the GSS is not a reliable testing tool for persons living in the United States.  GSS' normative data (the data to which responses are compared) is based upon populations in Great Britain and Iceland.  Thus, when Dr. Leo claims that "Phillipos' interrogative suggestibility" is "higher than 95% of adults in the general population" that does not refer to the general population in the United States.  *See* Report at 24.  Additionally, no link or causal connection has been established between a high level of suggestibility on the GSS and the occurrence of false confessions in the United States.  *See Jacques*, 784 F.Supp.2d at 64-65 (statistics showing a correlation between certain factors and the risk of false confessions are "meaningless in light of the well-known principle that correlation does not imply causation").  Consequently, any testimony that Phillipos' high level of suggestibility made it more likely that he falsely confessed should be excluded as mere conjecture and misleading to the jury.

## ARGUMENT

### I.   Leo's Proffered Testimony Fails to Meet the Reliability Requirements of Fed. R. Evid. 702.

Expert testimony must satisfy the requirements established by Federal Rule of Evidence 702 and the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

---

[2] For each disorder, the DSM-5 provides diagnostic criteria that must be present in order for a person to be classified as suffering from a specific disorder.  Such criteria are vital for diagnostic reliability.

U.S. 579 (1993), and its progeny, including *Kumho Tire Company v. Carmichael*, 526 U.S. 137 (1999). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial judge plays the important role as the gatekeeper in applying Rule 702's admissibility criteria. *Gaydar v. Sociedad Instituto Gineo-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24 (1st Cir. 2003); *see Daubert*, 509 U.S. at 589. The *Daubert* Court explained that when presented with a proffer of scientific expert testimony, "the trial judge must determine:"

> whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592-593.

Under Rule 702, the proponent of the expert bears the burden to show that the expert is qualified, that the testimony is reliable, and that it will fit the facts of the case. *See Daubert*, 509 U.S. at 589-90 & 592 n.10. The *Daubert* Court emphasized the importance of reliability: "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id*. at 589. The Court set out five non-exclusive factors for trial courts to consider when determining whether such testimony meets the implicit reliability requirements of Rule 702:

> (1) whether the technique or theory can be and has been tested;

(2) whether the technique or theory has been subject to peer review and publication;

(3) what the known or potential rate of error of the technique or theory is when applied;

(4) whether the expert maintained standards or controls the technique's operation; and

(5) whether the technique or theory has been generally accepted in the scientific community.

*Id.* at 593-94. Phillipos cannot meet his burden to show that Leo's methodology and opinions are reliable.

A. <u>Qualifications</u>

The government does not dispute that Leo is well educated and he has done extensive research in the area of police interrogation techniques and confessions. However, the statement in Leo's report that he has "been qualified and testified as an expert witness 280 times in state, federal, and military courts" is misleading. Ex. A (Report) at 2. Leo has never been allowed to testify as an expert witness in a federal criminal trial. To the contrary, several federal criminal courts have specifically rejected his proffered testimony. *See United States v. Redlightning,* 624 F.3d 1090, 1111-1116 (9th Cir. 2010) (approving district court's exclusion of Leo's proffered false confession testimony because it was riddled with inferential holes and not based upon sufficient facts of the case); *United States v. Deuman*, 892 F. Supp.2d 881, 888 (W.D. Mich. 2012) (excluding Leo's proffered false confession testimony on reliability, relevance, and Rule 403 grounds and concluding "false confession testimony of the type Dr. Leo can offer is nothing more than guesswork" as coercive interrogation techniques may lead to false confessions but also may lead to true confessions); *accord Jacques*, 784 F. Supp.2d at 65-68 (excluding, on reliability grounds, false confession testimony of a psychologist whose opinions were based, in part, on Leo's research). Similarly, numerous state courts have excluded Leo from testifying at criminal trials. *See, e.g., Vent v. State,* 67 P.3d 661, 667-670 (Alaska App. 2003) (upholding

exclusion of Leo's false confession testimony because "there was no way to quantify or test Dr. Leo's conclusions that certain techniques might lead to false confessions."); *People v. Kowalski*, 492 Mich. 106, 821 N.W. 2d 14, 31-32 (Sup. Ct. Mich. 2012) (approving exclusion of Leo's false confession testimony on grounds that it was "unreliable at every stage" and "resulted in conclusions consistent with Leo's own preconceived beliefs rather than testable results consistent with an objective, scientific process."); *State v. Rafay*, 168 Wash. App. 734, 285 P.3d 83, 111 (Wash. Ct. App. June 18, 2012) ("Leo has not developed a methodology based on his research that could assist in assessing the reliability of a particular confession.").

      B.      <u>Leo's proffered false confession testimony is unreliable</u>.

Leo's proffered false confession testimony is unreliable for four reasons: the false confession theories (1) have not been sufficiently tested, (2) have an unacceptably high rate of error, (3) depart from accepted scientific standards, and (4) have not been accepted in the relevant scientific community.[3] As a result, the present body of empirical research does not permit expert conclusions to be drawn about what police interrogation techniques produce false confessions and how they do so. Leo's proffered testimony therefore does not meet Rule 702's admissibility requirements.

---

[3] If the Court decides to hold a *Daubert* hearing, the government has retained Paul J. Cassell as an expert who will testify that, in his expert opinion, Leo's proffered testimony is unreliable. Cassell is the Ronald N. Boyce Presidential Professor of Criminal Law at the S.J. Quinney College of Law at the University of Utah. In addition to writing numerous scholarly articles, including an article criticizing Leo's work on false confessions, Cassell is a former Associate Deputy Attorney General, federal prosecutor, and District Court Judge (D. Utah from 2002-2007). In Cassell's opinion, among other things: Leo's research is based upon a miniscule sample of police interrogations from which no reliable, scientific conclusions can be drawn; Leo's research suffers from an extraordinarily high rate of error; and Leo's theories have not been accepted as reliable in the relevant scientific community. Cassell will also testify that to date, no researcher has conducted scientific research of actual police questioning to determine whether particular police techniques actually produce false confessions.

There are no reliable statistics about the number of false confessions that have occurred or the percentage of confessions that are false. Leo has conceded that it is impossible to estimate with any reliability the rate at which false confessions occur. Richard A. Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. Crim. L. & Criminology 429 (1998) ("no one can authoritatively estimate the rate of police induced confessions."); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 920 (2004) (noting "it is not presently possible to provide a valid quantitative estimate of the incidence or prevalence of interrogation-induced false confessions in America"); *id.* at 930 ("scholars do not know how frequently interrogation-inducted false confessions occur …."); *see Deuman*, 892 F. Supp.2d at 886 ("Dr. Leo testified at the *Daubert* hearing [that] there is no way of knowing how frequently false confessions occur in the real world"). In addition, Leo himself has admitted that there is no reliable data set for studying false confessions. *See* Richard A. Leo, *False Confessions: Causes, Consequences and Implications*, 37 J. Am. Acad. Psychiatry Law 332, 333 (2009). Nor is there any reliable method of measuring the myriad reasons a person may falsely confess. Numerous articles have been written on the subject of false confessions, many authored by Leo himself. While courts, including the Supreme Court, have recognized that false confessions have occurred (*see Corley v. United States*, 556 U.S. 303, 320-21 (2009)), the study of false confessions is highly controversial, and no objective, reliable methodology has been developed that can measure the rate at which false confessions occur compared to true confessions.

Due to the lack of statistically reliable evidence, the current false confession research does not form a sufficient basis for definite conclusions regarding the existence of a causal

relationship or even a significant correlation between any coercive police interrogation techniques and false confessions. Leo's own research is based upon a review of only an infinitesimal fraction of police interrogations. *See, e.g.*, Paul G. Cassell, *The Guilty and the "Innocent": An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 Harv. J. L. & Pub. Pol. 523, 588 (1999) (drawing attention to Leo's own admission that the cases relied upon for one false-confession study "do not constitute a statistically adequate sample of false confession cases"). Leo and Drizin's 2004 study published in the North Carolina Law Review discussed 125 cases of "proven" false confessions that occurred in the United States between 1971 and 2002. Leo and Ofshe's 1998 article in the Journal of Criminal Law and Criminology reports 29 cases of allegedly "wrongful" convictions from false confessions from the period 1973 to 1996. During the same thirty-year period studied by Leo, police interrogated millions of criminal suspects. No national statistics exist as to how many interrogations are conducted on an annual basis, but researchers have estimated that police obtain approximately 900,000 confessions and incriminating statements to serious crime each year. *See* Paul J. Cassell, *Protecting the Innocent from False Confessions and Lost Confessions – And From Miranda*, 88 J. Crim. L. & Criminology 497, 531-32 (1998); *see also* U.S. Dept. of Justice, Bureau of Justice Statistics, *Compendium of Federal Justice Statistics, 2004*, *available at* http://www.bjs.gov/content/pub/pdf/cfjs0402.pdf (in 2004, over 116,000 defendants were prosecuted in federal criminal cases). With such a statistically insignificant sample size, Leo's research is based upon insufficient facts and data to meet Rule 702's requirements for expert testimony.

Leo's research is also flawed because his samples were not randomly selected. Rather, as

8

the Michigan Supreme Court noted in affirming the trial court's exclusion of his testimony:

> Leo 'starts with the conclusion that the confession is false and then he works backwards' to find commonalities. The circuit court concluded that, rather than yielding factors common to all false confessions, Leo's method seemed to yield only factors common to confessions Leo believed to be false. This also made it impossible to test Leo's research or compute its rate of error.

*Kowalski*, 821 N.W.2d at 31.

Other courts have found similar flaws with Leo's methodology. The *Deuman* court determined that Leo's

> theories cannot discern whether a certain interrogation technique, used on a person with certain traits or characteristics, results in a predictable rate of false confessions. In addition, he has formulated no theory or methodology that can be tested.

892 F. Supp.2d at 886 (citation omitted). Similarly, the Ohio Court of Appeals concluded

> Dr. Leo has not formulated a specific theory or methodology about false confessions that could be tested, subjected to peer review, or permit an error rate to be determined. Dr. Leo's research on false confessions has consisted of analyzing false confessions, after they have been determined to be false. Dr. Leo explained that confessions are sometimes proven to be false after the fact through DNA exoneration, physical impossibility, or when the true perpetrator is caught. Dr. Leo has looked back at many such confessions and focused on reviewing the interrogation techniques that had preceded the false confessions, in an attempt to find common variables. Dr. Leo's research has focused in particular on similarities in the interrogation techniques that led to the false confessions. His research, however, has not led to any concrete theories or predictors about when and why false confessions occur.

*Wooden*, 2008 WL 2814346, *4.

Numerous other courts have excluded testimony of Leo and similar so-called false confession experts because their theories lack of reliability. *See Jacques,* 784 F. Supp.2d at 61 (excluding proffered false confession testimony because expert not qualified and "his testimony was not based on sufficient facts or data and did not involve the application of reliable principles or methods to the facts of this case."); *People v. Thomas*, 93 A.D. 3d 1019, 1031 (N.Y. App. Div.

2012) (in affirming exclusion of Professor Ofshe's false confession testimony, it noted that "the [trial] court determined that current research fails to establish either a consensus connecting specific interrogation techniques to the occurrence of false confessions or a reliable basis for distinguishing false confessions from truthful ones.").

        C.    <u>Leo's conclusions and risk factor analyses are premised upon factual inaccuracies</u>.

Leo's conclusions and risk factor analyses are based upon numerous erroneous facts. None of the agents yelled at or threatened Phillipos. Nor did they call him names or invade his personal space. As described in detail in the Government's Opposition to the Defendant Phillipos' Motion to Suppress Statements, at all times, the agents were polite to Phillipos. Additionally, the "sole purpose" of Phillipos' interviews was not to obtain a confession. *See* Ex. A (Report) at 6. On the contrary, agents assigned to the JTTF chose to interview Phillipos to obtain information and intelligence about Tsarnaev and his associates. That was the primary purpose of the interviews on April 19 and 20, 2013. Even after they suspected that Phillipos may be lying about his memory of entering Tsarnaev's dormitory room on the evening of April 18, 2013, the agents were still collecting information about the bombing and any other potential bomb plots. For example, during his interview on April 25, 2013, Phillipos was asked questions about Tsarnaev's associates and whether they harbored ill will towards the United States.

In addition, Leo mistakenly claims agents used "false evidence ploys" during the April 25 and 26, 2013 interviews of Phillipos. *See* Ex. A at 20. As indicated in Special Agent Delapena's report, the results of Phillipos' polygraph examination indicated that Phillipos was deceptive when he answered "no" to the question: "Do you remember going into Jahar's room on Thursday evening the 18th of April?" Similarly, Phillipos was not falsely told that "there was a security camera showing he entered Jahar's dorm room on April 18, 2013." *Id.* To the contrary, at the

10

April 25 interview, the interviewing agents told him that he "could have been caught on a security camera." In response, Phillipos "advised that the only security cameras in the dorm that he was aware of were downstairs at the front and back of the building. Furthermore, Phillipos advised that he did not believe those cameras to be operational."[4]

Moreover, none of the interviews, including the one that resulted in the defendant's confession, lasted longer than six hours. Indeed, the April 26, 2013 interview lasted approximately three hours, one hour of which was dedicated to polygraph testing. Accordingly, the interview that culminated in the defendant's signed written statement lasted approximately two hours. Leo cites to no empirical data for his conclusion that "most interrogations leading to false confession is more than six hours." Ex. A at 21. In any event, none of the interviews of Phillipos lasted more than three hours, so this risk factor is inapplicable.

Even if Leo were correct about any of his identified risk factors, as numerous courts have concluded, Leo cannot reliably demonstrate that any of the risk factors are more likely to result in a false confession than in a true confession. *See Rafay*, 285 P.3d at 111 ("Leo acknowledges that the same coercive interrogation methods that lead to false confessions also produce true confessions."). Additionally, Leo's analysis omits any reference of the details contained in Phillipos' written statement. This is striking because, in other cases, Leo has found the "post-admission narrative" to be one of the most important factors in determining the accuracy of a confession. *See Scott v. State*, 165 S.W.3d 27, 55 (Tex.App. 2005), *rev'd on other grds.*, 227 S.W.3d 670 (Tex.Crim.App. 2007) ("Leo said that it is impossible to determine whether a particular confession is true or false just by looking at the interrogation techniques that produced

---

[4] Phillipos' responses demonstrate that the security camera suggestion was not coercive and did not affect Phillipos' behavior in any way.

the confession. Instead, one must examine the 'post-admission narrative,' that portion of the interrogation after the person admits guilt, to determine whether or not the narrative contains details that the true perpetrator would be expected to know and that are consistent with the known facts."). As described in the government's trial brief and its Motion in Limine to Exclude Defense Experts Donald Davidoff and Alan Wartenberg, Phillipos written statements included several details that were not known to the interviewing agent.

> D.      Leo's testimony will not assist jury.

Leo's testimony will not assist the jury in understanding the evidence or determining a fact at issue. Indeed, his testimony is "based on nothing more than common sense" and "his techniques 'amount to nothing more than testing the details of the confession against the known facts.'" *Wooden*, 2008 WL 2814346, *5. Further, as the *Deuman* court concluded,

> While the problem of false confessions is indeed real, false confession testimony of the type Dr. Leo can offer is nothing more than guesswork: coercive interrogation techniques may lead to false confessions but also produce true confessions, and such techniques were used in this case so the confession or incriminating statements may or may not be false. The danger of allowing such testimony, then, is that the jury may conclude that Defendant's incriminating statements were false not because there is a sound evidentiary basis for doing so, but because Dr. Leo, an impressively-credentialed expert, says 'it is so.'

892 F. Supp.2d at 888.

> II.     **Leo's testimony should be excluded because it violates Fed. R. Evid. 704.**

"It is well established, and obvious, that an 'expert' cannot offer an opinion as to guilt or innocence at a criminal trial." *Jacques*, 784 F. Supp.2d at 63. Accordingly, experts have not been allowed to opine about the reliability of a defendant's confession because such testimony constitutes an "implicit opinion that the defendant is, in fact, not guilty." *Id.* Thus, Leo's testimony should be excluded because it will "encroach upon the jury's vital and exclusive function to make credibility determinations." *United States v. Benally*, 541 F.3d 990, 995 (10th

Cir. 2008) (upholding exclusion of false confession testimony).  The import of Leo's testimony would be to "disregard the confession and credit the defendant's testimony that his confession was a lie."  *Id.*

### III. Leo's testimony should be excluded on Fed. R. Evid. 403 grounds.

Even if the court finds that Leo's testimony meets the requirements of Rules 702 and 704, its limited probative value is substantially outweighed by unfair prejudice.  Additionally, Leo's testimony will mislead and confuse the jury.  His testimony should therefore be excluded.

### CONCLUSION

For the reasons set forth above, the government respectfully requests that this Court exclude Leo's proffered expert testimony.  Alternatively, the government requests that the Court hold a *Daubert* hearing before ruling on the admissibility and proper scope of his testimony.

        Respectfully submitted,

        CARMEN M. ORTIZ
        United States Attorney

By:    /s/ B. Stephanie Siegmann
        _____
        B. STEPHANIE SIEGMANN
        JOHN A. CAPIN
        Assistant U.S. Attorneys

<u>Certificate of Service</u>

I do hereby certify that a copy of foregoing was served upon the counsel of record for the defendant by email and hand delivery this 16th day of September 2014.

/s/ B. Stephanie Siegmann